# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**LARRY STARKS,**

**Plaintiff,**

v.

**CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1]

**Defendant.**

**No. 12 C 6124**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Larry Starks filed this action seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying his application for Supplemental Security Income under Title XVI of the Social Security Act. 42 U.S.C. 1614(a)(3)(A). The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and the parties have filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. SEQUENTIAL EVALUATION PROCESS

To recover Supplemental Security Income (SSI) under Title XVI of the Social Security Act (SSA), a claimant must establish that he or she is disabled within the

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

meaning of the SSA.[2] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI DIB is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Starks applied for SSI on May 22, 2009, alleging that he became disabled on December 1, 2007, due to Crohn's disease, status post right hemicolectomy, a history of ankylosing spondylitis, a cataract in the left eye, dysthymic disorder, anxiety, and depression. (R. at 13, 65, 155, 255, 421, 501). The application was denied initially and on reconsideration, after which Starks filed a written request for a hearing. (*Id.* at 11, 64–70, 76–82). On March 18, 2011, Starks, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 11, 26–63). The ALJ also heard testimony from Edward P. Steffan, a vocational expert (VE). (*Id.* at 11, 51–58, 101–04).

The ALJ denied Starks's request for benefits on March 31, 2011. (R. at 11–21). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Starks has not engaged in substantial gainful activity since May 22, 2009, the application date. (*Id.* at 13). At step two, the ALJ found that Starks's Crohn's disease, status post right hemicolectomy,[3] history of ankylosing spondylitis,[4] and cataract in left eye are severe impairments. (*Id.*). At step three, the ALJ determined that Starks does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 15).

---

[3] A hemicolectomy is the "[r]emoval of the right or left side of the colon." *Stedman's Medical Dictionary* 630 (5th ed. 1982).

[4] Ankylosing spondylitis is "arthritis of the spine, resembling rheumatoid arthritis, that may progress to bony ankylosis with lipping of vertebral margins; the disease is more common in the male and rheumatoid factor is often absent." *Stedman's Medical Dictionary* 1321 (5th ed. 1982).

The ALJ then assessed Starks's residual functional capacity (RFC)[5] and determined that he has the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), "that involves: no concentrated exposure to heights or hazards; no climbing ladders, ropes or scaffolds; limited depth perception, field of vision and accommodation with left eye; and the ability to take two unscheduled bathroom breaks per week, each lasting 5 minutes at a time." (R. at 15). At step four, the ALJ determined that Starks is unable to perform any past relevant work. (*Id*. at 19). At step five, based on Starks's RFC, age, education, and work experience, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Starks can perform, including ticket seller and fast food worker. (*Id*. at 19–20). Accordingly, the ALJ concluded that Starks was not suffering from a disability as defined by the SSA. (*Id*. at 20).

The Appeals Council denied Starks's request for review on June 5, 2012. (R. at 1–5). Starks now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Vallano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.

---

[5] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. MEDICAL EVIDENCE

Starks was hospitalized on November 15, 2007 for abdominal pain. (R. at 215). Later that month, he was hospitalized again, this time after complaining of chest pain, from November 30 to December 17, 2007. (*Id*. at 225). During his hospitalization, Starks developed acute abdominal pain and underwent a right hemicolectomy on December 9, 2007. (*Id*. at 225, 255). Starks also complained of neck pain and stiffness, and a bone scan performed during this hospitalization showed degenerative changes in the shoulders, knees, ankles, and feet. (*Id*. at 220, 223). At the time of his discharge on December 17, 2007, it was thought that seronegative spondyloarthropathy[6] and ankylosing spondylitis associated with Crohn's Disease were the likely diagnoses. (*Id*. at 225).

Starks was hospitalized again from January 29 to February 3, 2008, after complaining of abdominal pain. (R. at 228). Soon after, he was readmitted to the hospital from February 8–12, 2009, because of complaints of abdominal pain accompanied by blood in his stool. (*Id*. at 237).

From April 10 to April 12, 2008, Starks was hospitalized due to chest pain that was likely musculoskeletal in origin. (R. at 252). During this hospitalization, he had, for the second time in four months, a bowel movement with a small amount of blood. (*Id*.). Starks reported feeling anxious and depressed since his surgery and diagnosis of Crohn's disease, and was started on Fluoxetine for his depressed mood.

---

[6] Seronegative spondyloarthropathies are a "[g]roup of multisystem inflammatory disorders affecting various joints, including the spine, peripheral joints and periarticular structures." <http://www.ncbi.nlm.nih.gov/books/NBK27224/>

(*Id.* at 248, 250). Starks returned to the hospital complaining of abdominal pain on April 29 and was admitted until May 2, 2008. (*Id.* at 260). From July 8 to July 12, 2008, Starks was again admitted to the hospital with complaints of chest pain. (*Id.* at 467). During this hospitalization, the attending physician noted that Plaintiff's chest pain may be related to his depression and anxiety because of his flat affect, poor eye contact, and concerns about his own medical condition. (*Id.*). A psychiatric evaluation was ordered and Starks was diagnosed with Major Depression with anxiety, which was exacerbated by his medical conditions. (*Id.* at 412–13). During 2008, Starks visited the emergency room a number of times due to abdominal and chest pains. (*Id.* at 352, 355, 357, 359, 361, 365, 523–24, 530, 535).

On September 5, 2008, Starks treated with Pedro Dammert, M.D., a specialist in internal medicine who he had first seen in late 2007. (R. at 365, 407, 409, 416). Starks complained of insomnia and tightness in his chest. (*Id.* at 365). While Dr. Dammert found that his Crohn's disease was "better," he opined that Starks was highly anxious, and noted that his chest pain was probably related to this anxiety. (*Id.*).

On November 14, 2008, Starks again complained of insomnia and tightness in his chest. (R. at 367). Dr. Dammert noted that Starks's Crohn's disease was "not active." (*Id.*). Dr. Dammert also reported that Starks was still having "attacks" related to his depression/panic disorder, and prescribed clonazepam. (*Id.* at 368).

Starks was hospitalized from March 16 to March 19, 2009, because of abdominal pain due to constipation. (R. at 640). Starks returned to the hospital because of ab-

dominal pain on July 24 and was admitted until July 26, 2009. (*Id.* at 647). Starks also visited the emergency room a number of times in 2009, complaining of abdominal and chest pains as well as constipation. (*Id.* at 295, 301, 321, 373, 537, 560).

On April 10, 2009, Starks informed Dr. Dammert that he had no complaints, denied abdominal pain, and reported no insomnia or depressed mood. (R. at 377). Dr. Dammert concluded that his Crohn's disease was "not active," and that his depression/panic disorder was "controlled." (*Id.*).

Dr. Dammert also completed a Medical Evaluation Report on April 10, 2009. (R. 408–17). Starks's impairments included Crohn's disease, depression, nonanginal chest pain, depression, left-eye blindness, and spondylitis. (*Id.* at 416–17). Dr. Dammert found that Starks had a 20 to 50% reduced capacity for walking, bending, standing, stooping, sitting, turning, and climbing during an eight-hour workday. (*Id.* at 409). Dr. Dammert also indicated that he had up to a 20% reduced capacity for pushing, pulling, fine manipulation, gross manipulation and finger dexterity. (*Id.*). Dr. Dammert also concluded that Starks's response to treatment for both his mental impairments and Crohn's disease was "good." (*Id.* at 409, 417).

On August 7, 2009, Starks complained of numbness on the left side of his body, a problem Dr. Dammert attributed to somatization,[7] because of a lack of any other neurological findings. (R. at 310). Dr. Dammert increased the dose of Starks's

_____

[7] Somatization is "[t]he conversion of anxiety into physical symptoms." *Stedman's Medical Dictionary* 1301 (5th ed. 1982).

clonazepam, and also prescribed sertraline. (*Id.*). Dr. Dammert reported that Starks' Crohn's disease was "not active." (*Id.*).

On August 19, 2009, Herman P. Langner, M.D. performed a psychiatric evaluation on behalf of the Commissioner. (R. at 419). Dr. Langner examined Starks for 30 minutes. (*Id.* at 420). During that examination, he found Starks's affect to be somewhat flat, and opined that his sleep was erratic. (*Id.*). When Dr. Langner evaluated Starks's mental capacity, he was able to recall only one out of three items after three minutes, and in assessing his information/fund of knowledge, Starks was only able to name two large cities in the United States (Chicago and Justice) and when asked how many weeks in a year, he incorrectly answered "48." (*Id.*). Starks also had difficulty with the interpretation of proverbs, an indication that he had trouble thinking abstractly. (*Id.* at 421). Dr. Langner diagnosed a dysthymic disorder,[8] and Crohn's disease, by history, and estimated Starks's Global Assessment of Function (GAF) at 50.[9] (*Id.*).

On September 9, 2009, Howard Tin, Psy.D., a DDS nonexamining physician, completed a psychiatric review technique form. (R. at 422–35). Dr. Tin opined that Starks had a mild restriction on his activities of daily living, mild difficulties in

---

[8] "The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376 (4th ed. Text Rev. 2000) [hereinafter *DSM IV*].

[9] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." *DSM IV* 32. A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

maintaining social functioning and maintaining concentration, persistence, or pace, and had suffered no episodes of decompensation of an extended duration. (*Id*. at 432). Dr. Tin concluded that Starks's dysthymic disorder was not severe. (*Id*. at 422). On March 30, 2010, Terry A. Travis, M.D., a DDS nonexamining physician, affirmed Dr. Tin's assessment. (*Id*. at 539–41).

On September 18, 2009, Virgilio Pilapil, M.D., a DDS nonexamining physician, completed a physical RFC assessment. (R. at 436–43). Dr. Pilapil concluded that Starks's Crohn's disease was not currently active and that he was doing well. (*Id*. at 443). On April 1, 2010, Vidya Madala, M.D., another DDS nonexamining physician, affirmed Dr. Pilapil's assessment. (*Id*. at 539–41).

On September 25, 2009, Starks complained of numbness in his left arm and flank, as well as neck pain. (R. at 308). Dr. Dammert ordered a thoracolumbar, cervical and sacroiliac x-ray to rule out spondylitis. (*Id*.). Dr. Dammert also reported that Starks's Crohn's disease was "not active." (*Id*.).

On October 16, 2009, Starks reported feeling depressed, complained of two bloody bowel movements that week, and described pain in his neck and sacroiliac joints. (R. at 306). Dr. Dammert reported that the x-rays on Starks's spine and sacroiliac showed signs of inflammatory bowel disease associated arthritis, and noted that while Starks had had some hematochezia,[10] it was not a full flare up of his Crohn's disease. (*Id*.).

---

[10] Hematochezia is "[t]he passage of bloody stools, in contradistinction to melena, or tarry stools." *Stedman's Medical Dictionary* 627 (5th ed. 1982).

On October 26, 2009, Dr. Dammert completed another Medical Evaluation Report. (R. at 491–94). Starks's impairments included Crohn's disease, inflammatory bowel disease associated spondylitis, panic attacks, and major depression. (*Id.* at 491). Dr. Dammert made note of Starks's neck, thoracic and lumbar spine pain, as well as arthritis related to his Crohn's disease, and opined that Starks's response to the treatment for his Crohn's disease was "good." (*Id.* at 494). Starks's response to the treatment for his mental impairments was listed as "moderate." (*Id.* at 492). Dr. Dammert concluded that Starks was moderately limited in his ability to perform activities of daily living, and his concentration, persistence and pace suffered from a moderate limitation, while he was markedly limited in his ability to function socially. (*Id.*). Dr. Dammert also found that Starks had also suffered from four or more episodes of decompensation in the last 12 months. (*Id.*).

On October 26, 2009, Dr. Dammert also submitted a Crohn's and Colitis RFC assessment. (R. at 496–500). He concluded that because of Starks's Crohn's disease, panic attacks, and Crohn's disease associated spondylitis, Starks was capable of occasionally lifting 50 pounds, frequently lifting 20 pounds, and standing, walking, and sitting about four hours in an eight-hour workday. (*Id.* at 498). Dr. Dammert found that these impairments were likely to produce "good days" and "bad days" that would, in Dr. Dammert's estimation, force Starks to be absent from work more than four times a month. (*Id.* at 500). Dr. Dammert opined that Starks's frequent episodes of abdominal pain made him capable of tolerating a low-stress job, and his frequent unscheduled restroom breaks required that he have a job that permits

ready access to a restroom. (*Id*. at 498–99). Dr. Dammert also concluded that Starks was not a malingerer. (*Id*. at 497).

On the same day, Dr. Dammert also completed a Mental Impairment Questionnaire. (R. at 501–04). He opined that Starks had a marked restriction on his activities of daily living as well as a marked difficulty in maintaining social functioning. (*Id*. at 504). Starks suffered from frequent deficiencies of concentration, persistence or pace, and had repeated (three or more) episodes of deterioration or decompensation. (*Id*. at 504). Dr. Dammert found that Starks's panic attacks and depression would cause him to be absent from work more than three times a month. (*Id*. at 502).

From January 8–10, 2010, Starks was admitted to the hospital for abdominal and chest pain. (R. at 567). Starks's discharge summary noted "possible narcotic seeking behavior." (*Id*. at 568). Starks also began Remicade infusions to treat his Crohn's disease in June 2010, and the record shows that he continued that treatment through December 2010. (*Id*. 570–84).

On July 27, 2010 Starks began treating with Harlan Alexander, M.D., at Aunt Martha's Health Center.[11] (R. at 548). Dr. Alexander described Starks as unkempt with a blunted mood, and noted that Starks failed to answer questions directly and had decreased interest. (*Id*. at 547–48). Dr. Alexander noted that Starks had stopped taking all of his medications "a couple of weeks ago." (*Id*. at 546). Dr. Alex-

---

[11] "Aunt Martha's Health Centers provide access to high quality, cost-effective, affordable primary, behavioral, oral and preventive health care to all people who need it, regardless of their ability to pay." <http://www.auntmarthas.org>

ander concluded that Starks had suicidal ideations, but had no homicidal ideations. (*Id*.). Dr. Alexander diagnosed Starks as having recurrent major depression and generalized anxiety disorder.

On August 6, 2010, Starks returned for another appointment with Dr. Alexander, this time back on his medications. (R. at 545). Dr. Alexander described him as "minimally cooperative," prescribed Wellbutrin, and diagnosed him with a non-specified cognitive disorder, in addition to the earlier diagnoses recurrent major depression and generalized anxiety. (*Id*.) On October 22, 2010, Starks again saw Dr. Alexander, who described him as "subdued." (*Id*. at 544). When asked about suicidal ideations, Starks replied "I don't know really." (*Id*.).

On December 21, 2010, Dr. Alexander described Starks as arriving at his appointment with a "subdued positive presentation." (R. at 633). When asked about suicidal ideations, Starks again replied, "To be honest, I don't know." (*Id*.). Dr. Alexander noted that Starks had brought with him "forms for application for disability," and emphasized "not having any money in his pocket." (*Id*.).

During an appointment on February 4, 2011, Dr. Alexander noted that Starks was focused on getting his forms filled out for disability. (R. at 632). Dr. Alexander noted Starks' subdued positive presentation, and when asked about suicidal ideations, Starks responded that his symptoms have not gotten better, and that it was "pretty much going through my mind." (*Id*.).

At the hearing, Starks testified that on a daily basis his abdominal pain rates as a six on a ten-point scale, but during a flare up of his Crohn's disease, which he said

happens three to four times a year, his pain is "off the chart." (R. at 39–40). If a flare up lasted over a half-hour, he testified that he would go to the emergency room. (*Id.* at 39). He testified that for the past year and half, he has had to use the restroom seven to eight times a day, each trip taking about 10 to 15 minutes. (*Id.* at 41). In addition to his abdominal pain, he testified that the pain in his neck and back keep him from sitting or standing for more than 45 minutes at a time. (*Id.* at 47–48).

When asked at the hearing about his anxiety and depression, Starks testified that his anxiety prevented him from sleeping well, and his inability to do the thing he was previously able to do left him frustrated and stressed. (R. at 47). Starks stated that because there was not much that he could do, a typical day was spent sitting around the house. (*Id.* at 49).

Starks testified that he no longer drives, but is able to take public transportation. (R. at 36). At his hearing he also said that while he used to be able to walk about a mile and a half, for the last seven to eight months he had become fatigued after walking about four to five blocks. (*Id.* at 42–43).

## V. DISCUSSION

### A. Dr. Dammert's Opinion

Starks contends that the ALJ failed to properly weigh Dr. Dammert's opinion. (Mot. 12–15). He asserts that the reasons the ALJ gave for affording little weight to Dr. Dammert's opinions lack support. (*Id.* 12). Starks argues that the ALJ failed to

provide good reasons for rejecting Dr. Dammert's opinion and failed to discuss the factors that must be considered when a treating source's opinion is not given controlling weight. (*Id.* 15).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded to opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a non-treating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given

for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

Starks treated with Dr. Dammert beginning in December 2007 through at least October 2009. (R. at 416, 491). During that time, Dr. Dammert treated Starks for a multitude of conditions, including Crohn's disease, IBD associated spondylitis, panic attacks, and major depression. (*Id*. at 491). In April 2009, Dr. Dammert opined that Starks had a 20–50% reduced capacity for standing, sitting, and walking during an eight-hour workday. (*Id*. at 409). He also found that Starks had experienced two episodes of decompensation in the last 12 months, and was mildly limited in his ability to perform activities of daily living and function socially. (*Id*.).

In October 2009, Dr. Dammert concluded that because of his frequent episodes of abdominal pain, Starks was not capable of standing or sitting for more than two hours at one time or more than four hours in an eight-hour workday. (R. at 498). Dr. Dammert opined that Starks would frequently need to take unscheduled restroom breaks during the workday, and that these breaks would keep him away from his workstation for an average of 30 minutes. (*Id*. at 499). He found that Starks's impairments would produce "good days" and "bad days," and estimated that Starks's impairments would cause him to be absent from work more than four times a month. (Id. at 500).

In assessing Starks's mental impairments in October 2009, Dr. Dammert found that Starks had a current GAF of 45; he also found that Starks had: appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional liabil-

ity, recurrent panic attacks, pervasive loss of interests, psychomotor agitation or re-tardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat or in-appropriate affect, decreased energy, obsessions or compulsions, generalized persis-tent anxiety, somatization, and hostility and irritability. (*Id.* at 501). He concluded that Starks's impairments would cause him to be absent from work more than three times a month, and found that because of Starks's depression and panic attacks, he had poor or no ability to: complete a normal workday and work week without inter-ruptions from psychologically based symptoms, perform at a consistent pace without unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, deal with nor-mal work stress, and be aware of normal hazards and take appropriate precautions. (*Id.* at 503). Dr. Dammert opined that Starks had experienced three or more epi-sodes of decompensation in work or work-like settings, had marked limitations in both activities of daily living as well as social functioning, and had frequent defi-ciencies in concentration, persistence, or pace. (*Id.* at 504).

In her decision, the ALJ gave Dr. Dammert's assessments "little weight" be-cause:

> [h]e imposes significant limitations without supporting objective medi-cal evidence. For example, he reports that the claimant had episodes of decompensation, but there is no evidence of this. He also states that the claimant has a diminished ability to walk, when the claimant him-self reported that he walked 2–3 miles per day. There are also no rec-ords for his eye, especially no records documenting blindness as Dr.

> Dammert states. Overall, his opinions are inconsistent with his own
> treatment notes, and with the medical evidence of record, which shows
> that the claimant's Crohn's condition is controlled and his mental im-
> pairments are not severe.

(R. at 18) (citations omitted). Instead, the ALJ afforded "great weight" to the opin-
ion of Dr. Pilapil, a DDS nonexamining physician, because "it is consistent with the
medical evidence of record." (*Id.*).

Under the circumstances, the ALJ's decision to give Dr. Dammert's opinion "lit-
tle weight" is legally insufficient and not supported by substantial evidence. Dr.
Dammert's opinions are supported by the medical evidence and are not inconsistent
with his treatment notes. Dr. Dammert's conclusion that Starks's Crohn's disease
produced "good days" and "bad days" that were likely to force him to be absent from
work more than four times a month are supported by Starks's numerous hospitali-
zations and emergency room visits (*see, e.g.*, R. at 215, 225, 228, 237, 252, 260, 467,
567, 640, 647 (10 hospitalizations in 26 months); *id.* at 295, 301, 321, 352, 355, 357,
359, 361, 365, 373, 523, 530, 535, 537, 560 (15 ER visits in 26 months)), as well as
Dr. Dammert's own treatment notes, (*see, e.g., id.* at 367 (Crohn's disease is "not ac-
tive"), 306 (noting that Starks had recently experienced some bloody stools)), which
demonstrate the cycling nature of Crohn's disease as a condition that may "have pe-
riods of time when [patients] have no signs or symptoms."[12] The ALJ cited Starks's
statement that he walked 2–3 miles a day, contrasting it with Dr. Dammert's opin-
ion that Starks had "a diminished ability to walk," as an example of a limitation un-
supported by the medical evidence. (*Id.* at 18). However, Starks's statement is not

---

[12] <www.mayoclinic.org/diseases-conditions/crohns-disease/basics/symptoms>

inconsistent with Dr. Dammert's assessment of his limitations. While Dr. Dammert opined that Starks could walk only four hours in an eight-hour workday, he did find Plaintiff capable of walking the equivalent of *more* than 10 city blocks in a competitive work situation. (*Id.* at 498). Starks's statement that he was able to walk two to three miles during a 24-hour period is not inconsistent with Dr. Dammert's opinion that Plaintiff could walk at least 10 blocks during an eight-hour workday.

Furthermore, Dr. Dammert's conclusion that Starks suffered from marked mental limitations is supported by the medical evidence. (*See*, *e.g.*, R. at 413 (insomnia; major depression, exacerbated by medical conditions), 365 (high anxiety), 546 (suicidal ideations), 547 (decreased interest; isolative behavior, withdrawal from family members), 548 (poor insight and judgment; slowed speech; blunted mood; generally unkempt)). In rejecting Dr. Dammert's opinions of Starks's mental impairments, the ALJ opined that Starks had suffered no episodes of decompensation, and found Dr. Dammert's reports of multiple instances of decompensation to be unsupported by the medical evidence. (*Id.* at 18). But decompensation is "not a self-defining phrase" that has a single, specific meaning. *Larson v. Astrue*, 615 F.3d 744, 750; *see also Stedman's Medical Dictionary* 366 ("The appearance or exacerbation of a mental disorder due to failure of defense mechanisms"); *Zabala v. Astrue*, 595 F.3d 402, 405 (2d Cir. 2010) (a temporary increase in symptoms); *Rabbers v. Comm'r*, 582 F.3d 647, 660 (6th Cir. 2009) (side effects of medication affecting a claimant's ability to function); *Natale v. Comm'r*, 651 F. Supp. 2d 434, 451–53 (W.D. Pa. 2009) (a history of adjustments to medication and fluctuating mood); 3 Social Security Law and

Practice § 42:124 (2010) ("Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation."). The listing recognizes that an episode of decompensation may be inferred from medical records showing a significant alteration in medication, or an incident, like a hospitalization, that signals the need for a more structured psychological support system. 20 C.F.R. pt. 404, subpart P., app. 1, § 12.00; *Larson*, 615 F.3d at 750.

In light of the myriad ways the term has been used, the ALJ has adopted a definition of "decompensation" that is too narrow. A fair reading of the record indicates several instances that support Dr. Dammert's conclusion that Starks had suffered a number of episodes of decompensation. (See e.g., R. at 413 (started on new medication, Lorazepam, due to insomnia; psychiatric impairments exacerbated by medical conditions), 368 (added new medication, Clonazepam, because of continued panic attacks despite Fluoxetine), 310 (increased dosage of clonazepam, from .5 TID to 1 TID; added new medication, sertraline)).

Furthermore, the ALJ relied on the conclusions of Drs. Tin and Travis, the two nonexamining DDS physicians. (R. at 13–14). However, in coming to their conclusions, the state agency reviewers did not have the opportunity to examine a significant amount of medical evidence that was submitted after their assessments. (*Id.* at 501–04, 542–48, 632–33). This medical evidence contradicts many of the examples cited by the ALJ, and may have affected the assessments of the state agency reviewers. For example, in her decision, the ALJ stated that "[t]he claimant reported

good contact with his mother, and noted that his family is very supportive" (R. at 14), but evidence submitted after the state review documented that Starks stopped associating with his family and would remain in his room with his door shut. (*Id.* at 547).

Additionally, on behalf of the Commissioner, Dr. Langner conducted a brief, 30-minute evaluation of Starks, much of which was spent collecting background information. (R. at 419–21). Despite the evaluation's brevity, Dr. Langner diagnosed Starks as having a dysthymic disorder, and assigned him a GAF score of 50, which indicates a serious impairment in occupational functioning. (*Id.* at 421); *see DSM IV* 34. Both of these opinions are consistent with Dr. Dammert's conclusions. (*Id.* at 501–04). The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles v. Astrue*, 582 F.3d 672, 6748 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.ed 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Finally, the ALJ asserted that Dr. Dammert's opinion that Starks suffered from vision problems, including blindness in his left-eye, was not supported by medical evidence in the record, and that this inconsistency offered more evidence that his evaluations and assessments deserved "little weight." (R. at 18). The record does,

however, include notes from a specialty care center eye clinic from October 3 and December 16, 2008, that show left eye blindness. (*Id.* at 371).

Generally, the Commissioner gives more weight to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527.

Here, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson*, 615 F.3d at 751 (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). And many of the factors support the conclusion that Dr. Dammert's opinion should be given great weight: he treated Starks for over two years, his findings were supported by diagnostic observations, and his findings were consistent with the medical evidence. "Proper consideration of these fac-

tors may have caused the ALJ to accord greater weight to [Dr. Dammert's] opinion." *Campbell*, 627 F.3d at 308.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Dammert's opinion. If the ALJ has any questions about whether to give controlling weight to Dr. Dammert's opinion, he is encouraged to recontact him, order an updated psychological consultative examination, or seek the assistance of a medical expert. *See* Social Security Ruling (SSR) 96-5p, at *2;[13] 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving Dr. Dammert's opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Dammert's opinion.

---

[13] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

## B. Credibility

Starks contends that the ALJ failed to perform a proper credibility analysis. (Mot. 16–19). He asserts that in making an improper credibility finding, the ALJ did not consider Starks's reasons for not obtaining further treatment, did not properly take into account the context of treatment notes that the ALJ found suspicious, cited record inconsistencies that were not solid and well supported, and failed to analyze the requisite credibility factors. (*Id*.).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective

medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

In her decision, the ALJ made the following credibility determination:

> Numerous factors militate against a finding of greater restriction than that delineated in my residual functional capacity find. For example, in April 2008, notes from the emergency room indicate that the client "works as a mover." However, he reported to the consultative examiner that he last worked as a truck driver in August 2007. The claimant attended Aunt Martha's for depression, but notes indicate that the claimant's attorney sent him there. The focus at Aunt Martha's appeared to be filling out forms for disability. The claimant was also not always compliant with his medication. Although the claimant testified that he could not walk more than 4 or 5 blocks before becoming fatigued, he indicated at Aunt Martha's that he stays active by walking at least 2–3 miles every day. Further, the claimant was suspected of malingering and narcotic seeking behavior. These factors combine to diminish the claimant's credibility.

(R. at 18–19).

Here, none of the reasons provided by the ALJ for rejecting Starks's credibility are legally sufficient or supported by substantial evidence. First, the ALJ referred to Starks's inconsistent compliance with taking his medication as a factor that diminished his credibility. (R. at 19). However, the ALJ is required to "explore the claimant's reasons for the lack of medical care before drawing an adverse inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

The record documents Starks's difficulty in paying for his medications due to a lack of insurance and resources, and he testified at his hearing that his only income was food stamps (R. at 36, 176). The SSA "has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment." *See,* SSR 96-7p, at *8 ("The individual may be unable to afford treatment and may not have access to free or low-cost medical services.").

An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR-96-7p, at *7; *accord Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013). If the ALJ believed that Starks's lapses in medication compliance damaged his testimony regarding the "intensity, persistence, and limiting effects" of his symptoms, the ALJ should have questioned Starks at the administrative hearing on this issue before discounting his credibility. SSR 96-7p, at *7 (The ALJ "may need to . . . question the individual at the administrative pro-

ceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.").

Second, the purported inconsistencies in the record that the ALJ referenced as undermining Starks's credibility were not supported by substantial evidence. While the ALJ is in the best position to observe witnesses, "when an ALJ's credibility determination rests on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335–36 (7th Cir. 1994).

A doctor's report from July 2010 noted that Starks was staying active by walking at least two to three miles every day; at his hearing in March 2011, Starks testified that he could not walk more than four or five blocks before becoming fatigued. (R. at 42, 547). In holding these two statements to be inconsistent, the ALJ did not consider Starks's subsequent statement that he had only been limited to walking four or five blocks for eight to nine months, and before that he had been walking a lot more. (*Id.* at 42–43). The July 2010 report and the March 2011 hearing testimony are not inconsistent with one another, and so the testimony does not support the ALJ's credibility determination.

Similarly, an in-patient history and physical examination from April 2008 notes in the Social History section that Starks "works as a mover," while Starks reported to the consultative examiner that he worked primarily as a truck driver, and had

last worked in August 2007. (R. at 256, 419). The ALJ cited these as an example of inconsistency, but did not explain the contradiction she took from these reports, and the Commissioner makes no attempt to identify what the ALJ may be referring to. (*See* Resp. 12). One possible explanation is that the ALJ misunderstood Starks's vocational background, thinking that the inconsistency lay in the nature of Starks's work. However, the vocational expert explained that a truck driver who works for a moving company is also expected to help with the moving and loading of the truck. (R. at 53). Another possible explanation is that the ALJ found the dates of employment to be incongruous; however this inference is also not supported by the record. Read in context, the April 2008 history and physical examination report describes Starks as historically having been employed as a mover, especially in consideration of the fact that this was the seventh time Starks had been admitted to the hospital in the past six months. (R. at 255). Furthermore, these forms were both in the record at the time of the hearing; if the ALJ felt that the statements were incompatible with one another, the ALJ should have questioned Starks at the administrative hearing on this issue before discounting his credibility. After a careful review of the testimony and the evidentiary record, the Court does not find support for the inconsistencies that led the ALJ to reject Starks's testimony.

Third, the ALJ's references to Starks as being suspected of malingering and displaying narcotic seeking behavior (R. at 19) do not find sufficient support in the record. While the ALJ relied upon one discharge summary that reported "possible" narcotic seeking behavior (*id.* at 568), nowhere else in Starks's 469 pages of medical

records is there any mention of such conduct. Additionally, Starks's own primary care physician opined that he was not a malingerer. (*Id*. at 497). In fact, DDS's own nonexamining physician opined that Starks was "generally credible" in his physical RFC assessment, and the consultative examiner that performed a psychiatric evaluation on behalf of the Commissioner found Starks to be "reliable." (*Id*. at 419, 443). The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles*, 582 F.3d at 678; *Murphy*, 496 F.3d at 634.

Finally, the ALJ's conclusion that Starks's treatment at Aunt Martha's was intended to exaggerate and fraudulently bolster his disability claims, thus diminishing his credibility, is not supported by substantial evidence. This opinion is inconsistent with the entirety of Starks's treatment history at Aunt Martha's. There was no finding during Starks's five appointments at Aunt Martha's indicating that he was a malingerer; in fact, Starks was diagnosed with recurrent major depression, generalized anxiety, and a nonspecified cognitive disorder during his visits to Aunt Martha's, and the record showed that he experienced suicidal ideation, demonstrated a blunted mood, and showed decreased interest during his examinations. (R. at 545, 546, 547–48). These symptoms and diagnoses are consistent with Starks's medical history, as described above. The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles*, 582 F.3d at 678; *Murphy*, 496 F.3d at 634.

On remand, the ALJ shall reevaluate Starks's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Dammert's opinion, explicitly addressing the required checklist of factors. The ALJ shall reassess Stark's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Stark's physical and mental impairments and RFC, considering all of the evidence of record, including Stark's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **GRANTED**. Defendant's Motion for Summary Judgment [24] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: April 21, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge